NOTICE

Decision filed 05/01/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 231276-U

NOS. 5-23-1276, 5-23-1277 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* MAL. H. and MAX. H., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Marion County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 20-JA-57, 20-JA-59 |
| | ) | |
| Michelle H., | ) | Honorable |
| | ) | Ericka A. Sanders, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE McHANEY delivered the judgment of the court.
Justices Welch and Cates concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Where the trial court's orders finding that Michelle H. was an unfit parent and that the best interest of the minor children warranted termination of her parental rights were not contrary to the manifest weight of the evidence, we affirm the orders.

¶ 2    Michelle H. (Michelle) is the mother of Mal. H., a girl, and Max. H., a boy. The Department of Children and Family Services (DCFS)[1] removed the children from Michelle's home in April 2020. Due to Michelle's failure to make reasonable efforts and progress towards the return of the children, the State filed a motion to terminate her parental rights. After the trial court found that

_____

    [1]DCFS utilized the services of a local service provider, Caritas Family Solutions, in this case. Although not interchangeable, throughout much of this order, we refer to both entities as DCFS.

1

Michelle was an unfit parent, the court concluded that it was in the best interest of Mal. H. and Max. H. to terminate her parental rights. She appeals from these orders.

¶ 3                                    I. BACKGROUND

¶ 4     Mal. H. was born on February 5, 2018. Max. H. was born on November 1, 2016. Michelle is the mother of both children and McArthur H. (McArthur) is the father[2] of both children.

¶ 5     On April 15, 2020, DCFS received a report from the Salem Police Department, which received an anonymous call reporting domestic violence between Michelle and McArthur. Michelle was reportedly the aggressor, but there were reports that McArthur had been abusive to both Mal. H. and Max. H. A third child, G.S.,[3] was sent to live with his maternal aunt for one week.

¶ 6     While the investigation of the April 15, 2020, incident was ongoing, the Salem Police Department were called again to the family's home on April 19, 2020, on a report of domestic violence. McArthur was the individual who contacted the police. Michelle was intoxicated and she and McArthur got into an argument that turned physical. Due to the bruising and injuries to Michelle, the police arrested McArthur. The children were unharmed. As DCFS was investigating the April 19, 2020, incident, an investigator spoke with the older child, G.S., who reported that his mother and McArthur had been fighting since August 2019. G.S. stated that McArthur had never been physical with him, and he had never seen McArthur be physical with his younger sister and

---

[2]McArthur died during the pendency of this case.

[3]This third child, G.S., was not in the home when the incident occurred. G.S. is a male child born on May 26, 2006. His mother is Michelle, and his father is Jordan S. Although G.S. was not present when the domestic violence occurred, DCFS took him into protective custody because he was scheduled to return to Michelle's home at a later date after the incident. DCFS reported that Michelle had two prior unfounded investigations related to G.S. in 2007. G.S. is not part of this appeal.

brother. Ultimately, McArthur was released without charges, and DCFS took the children into protective custody.

¶ 7    On April 20, 2020, the State filed its petition for adjudication of wardship alleging that Mal. H. and Max. H. were neglected in that there had been several incidents of domestic violence that occurred in the presence of the children. The State alleged that the incidents resulted in an environment injurious to the welfare of the children. 705 ILCS 405/2-3(1)(b) (West 2018). On that same date, the State also filed its motion seeking temporary custody of the children.

¶ 8    On April 21, 2020, the trial court held the shelter care hearing. The State called Tera Romines, a child protection investigator for DCFS.

¶ 9    This case was assigned to her on April 15, 2020, after DCFS received a report of domestic violence in the home. Michelle had allegedly posted photos on a social media site of bruises on her body and bruises on Max. H.'s neck. That social media post led a reporter to contact DCFS. Upon arrival at the house, Michelle informed Romines that she was intoxicated and instigated the fight with McArthur. Michelle denied that McArthur had ever laid hands on her and/or the children.

¶ 10    Romines also testified that she received the emergency call from the Salem Police Department on April 19, 2020. The police were called to the home due to domestic violence. Michelle was intoxicated. Police arrested McArthur. Mal. H. (then two years old) and Max. H. (then three years old) were present in the home. Romines traveled to Michelle's home. She informed Romines that she had "put on a good act" the previous week, but truthfully McArthur "beats her ass." She showed Romines her fresh bruising on her back, her lip, and her chin. Michelle had videotaped part of the alleged attack on her cell phone. Romines reviewed the video and noted that Mal. H. and Max. H. were depicted on the video. In the video, McArthur lunged toward

3

Michelle, and she dropped her cell phone. Michelle told Romines that when she dropped the phone, McArthur hit her in the mouth. Michelle acknowledged that she had been drinking shots of Fireball brand whiskey all night. Romines testified that Michelle appeared to be intoxicated that morning, in that she was slurring her speech and kept repeating herself. Romines stated that based upon that situation, the children could not be released to Michelle's care.

¶ 11 Romines testified that she spoke with McArthur after he was released from the Salem County jail on April 20, 2020. McArthur denied Michelle's version of events and said that Michelle came after him with a padlock she was wielding like a weapon and ended up hitting herself in the mouth with the padlock when he moved out of her way. Romines testified that there was no question that Michelle and McArthur argued, and the arguments turned physical, and that the children were present in the home during those fights. She stated that all three children were placed with a maternal aunt in Alma. At the time of the April 19, 2020, fight, the oldest child, G.S., was staying with a relative. Romines testified that Michelle remained in the home, and that McArthur told her he was going to move in with his mother in Centralia.

¶ 12 At the conclusion of the shelter care hearing, the trial court found that there was probable cause to believe that the children were neglected given the history of domestic violence between Michelle and McArthur. The court found that there was an immediate and urgent necessity to remove Mal. H. and Max. H. from the home on the basis that the home environment was potentially injurious to their welfare. The court ordered that the minors be placed in shelter care consistent with their health, safety, and best interest and granted temporary custody and guardianship to DCFS.

¶ 13 On May 15, 2020, DCFS filed a status report with the trial court. Michelle had recently checked herself into the Caseyville Gateway Foundation (Gateway) substance abuse treatment

4

facility. Five days later, Michelle checked herself out of the facility after she completed detox, but without completing rehabilitation treatment. Gateway offered to transfer her to another residential facility, but Michelle declined. Gateway suggested that Michelle transfer to a Gateway facility in either Springfield or Carbondale. Michelle reported that she was on the waitlist at both facilities, but DCFS was unable to confirm these facts. On May 11, 2020, DCFS recommended that Michelle contact substance abuse facilities in Charleston and Champaign for inpatient services. While waiting for an inpatient slot, DCFS referred Michelle to Community Resource Center (CRC) for outpatient services. DCFS confirmed that Michelle was scheduled for a substance abuse assessment at CRC on May 14, 2020. DCFS also referred Michelle for a mental health assessment to be completed at CRC on that same date. DCFS required Michelle to complete parenting and domestic violence services, and she was provided with a list of providers.

¶ 14    In July 2020, DCFS filed its report in advance of the adjudicatory hearing. DCFS reported that Michelle had threatened to kill herself "if she was a bad mom" and showed up for an appointment with visible marks on her neck. Michelle reported that McArthur had beaten her up. Michelle had begun services for parenting, mental health, and outpatient substance abuse. She took a drug test at CRC that was positive for marijuana. She had missed a few of her outpatient substance abuse group sessions due to a lack of available minutes on her mobile phone. CRC continued to recommend inpatient substance abuse treatment for Michelle. Michelle was currently not eligible to engage in parenting classes until she successfully completed anger management classes. DCFS reported that Michelle had begun anger management group and had missed two of those sessions.

¶ 15    On July 21, 2020, the State filed an amended petition seeking adjudication based on domestic violence in the home between Michelle and McArthur in the presence of the children and

added an allegation that Michelle had committed individual acts of domestic violence in the home. On July 22, 2020, the trial court held an adjudicatory hearing. The State called three witnesses: Michelle, Tera Romines with DCFS, and Officer Craig Phillips with the Salem Police Department.

¶ 16    Michelle testified that she and McArthur have two children. She stated that on April 15, 2020, she was not living with McArthur. When the State asked her if on April 15, 2020, and/or on April 19, 2020, McArthur committed an act of domestic violence against her, she responded that she had lied to the police in claiming that he had battered her on both of those dates.

¶ 17    Romines testified that she was called to investigate reports of domestic violence between Michelle and McArthur on both April 15, 2020, and April 19, 2020. On April 19, 2020, when Romines arrived at Michelle's house, McArthur had already been removed from the house and taken to jail. Mal. H. and Max. H. were inside the home with Michelle's father and aunt. Michelle was outside of the trailer and noticeably intoxicated. Michelle alleged that McArthur had punched her in the mouth and threw her up against a toilet. Romines testified that Michelle's lip was cut, and she had a softball-sized bruise on the back of her left shoulder. She stated that there were bruises "up and down her arms." Based upon what Romines found upon arrival at the scene, she determined that the children needed to be taken into protective custody.

¶ 18    Next, Sergeant Craig Phillips of the Salem Police Department testified that he was called to Michelle's house on April 15, 2020. Upon his arrival, he noted that there was a female outside of the house yelling at a male who was standing in the doorway. He spoke with McArthur who stated that he was babysitting his children because of Michelle's intoxicated state, and that Michelle had been yelling at him for the past two hours. McArthur indicated that the police were called because Michelle was intoxicated and had been physically attacking him. Sergeant Phillips confirmed that there were two children inside the home.

6

¶ 19     Sergeant Phillips testified that he was also called to the trailer on April 19, 2020. Upon arrival, Sergeant Phillips heard a female yelling at someone to leave the house. Sergeant Phillips then heard a male telling the female to quiet down so that the children would not wake up. Michelle told Sergeant Phillips that McArthur had beaten her. He noted that her lip was swollen and cut. Michelle informed him that the children were present during the attack. McArthur disputed Michelle's version of events, denied that he hit her, and stated that she had attacked and choked him. Regarding Michelle's cut lip, McArthur told Sergeant Phillips that Michelle was swinging a lock at him but hit herself instead.

¶ 20     After testimony and arguments of counsel, the trial court noted that the purpose of the adjudicatory hearing was to determine whether the children were neglected—not who was the cause of the neglect. The court stated that an environment where the children are present, and adults are yelling and committing acts of domestic violence—whether said violence was verbal or physical—is injurious to the children's development. The court found that the evidence established that Michelle was physically aggressive and committed domestic violence against McArthur in the presence of the children. In the written order, the trial court found that the State established by a preponderance of the evidence that Michelle and McArthur committed acts of domestic violence in the presence of the children, which made their home environment injurious to their welfare. 705 ILCS 405/2-3(1)(b) (West 2018).

¶ 21     On August 20, 2020, DCFS filed a dispositional report. On August 10, 2020, Michelle voluntarily checked herself into The Pavilion in Champaign for inpatient substance abuse treatment. On August 17, 2020, Michelle reported that she was "discharged" from The Pavilion. DCFS reported that Michelle had missed four of her individual mental health sessions and two of

her integrated domestic violence, substance abuse, and mental health group sessions. Michelle was engaging in her supervised visitation with the children.

¶ 22    On August 26, 2020, the trial court held the dispositional hearing. The State did not call any witnesses. At the conclusion of the hearing, the trial court determined that it was important for DCFS to maintain custody and guardianship of Mal. H. and Max. H. The court noted that Michelle had only completed a seven-day detox program and had not continued with inpatient substance abuse care.

¶ 23    Following the hearing, the trial court entered its dispositional order on August 31, 2020. The court found that for reasons other than finances alone, Michelle was not able to care for, protect, train, educate, supervise, or discipline the children. The court granted the State's petition, found that the minors were neglected, and made them wards of the court. The court also placed guardianship of the minors with DCFS.

¶ 24    DCFS filed a family service plan dated October 9, 2020. The start date of this service plan was April 29, 2020. DCFS completed the evaluation of Michelle's progress on the service plan objectives on October 12, 2020. Michelle was rated unsatisfactory on all service plan objectives: substance abuse, mental health, parenting, domestic violence, employment, cooperation with DCFS and providers, and visitation. She was rated satisfactory on housing. With the substance abuse service plan objective, DCFS noted Michelle's brief inpatient stay at Gateway in Granite City, but Michelle had not yet resumed inpatient substance abuse treatment. On October 6, 2020, Michelle informed her caseworker that she had decided not to engage in inpatient substance abuse treatment because she had just gotten hired at North American Lighting. DCFS also reported that Michelle was required to participate in drug tests. She participated in one drug test on July 23, 2020, that was negative. She did not appear for six other tests between July 9, 2020, and September

8

30, 2020, which DCFS construed as positive results. With the domestic violence service plan objective, Michelle was removed from her integrated domestic violence, substance abuse, and mental health group, and from her anger management group for missing too many sessions. To be allowed back into both of those treatment groups, Michelle was required to have an individual mental health counseling session at CRC.

¶ 25    DCFS filed a permanency hearing report on October 29, 2020. Michelle was still not allowed to attend her integrated group sessions or anger management sessions because she had not yet completed the required individual counseling session. Michelle was scheduled for an individual session on October 19, 2020, but was unable to attend because she was scheduled to work at her new job with North American Lighting in Salem. DCFS reported that because Michelle was working mandatory overtime, she had not been able to engage in supervised visitation with her children. DCFS recommended that custody and guardianship of the children remain with DCFS.

¶ 26    On November 17, 2020, DCFS filed an addendum to the October 29, 2020, permanency hearing report, noting that on November 13, 2020, Michelle reported that she had been drinking and was arrested for battery of a police officer. On December 9, 2020, the trial court held a permanency hearing, and on December 16, 2020, entered a permanency order, finding that the appropriate permanency goal was to return the children home within 12 months.

¶ 27    DCFS filed an addendum to the permanency hearing report on January 27, 2021, noting that due to Michelle's work schedule, she had not been able to participate in services until the end of December 2020. On January 11, 2021, Michelle reported she had an individual counseling session. Because she had completed the individual session, she was allowed to resume the integrated group sessions and anger management group sessions. Michelle failed to appear for mandatory drug tests on December 11, 2020, and January 19, 2021. DCFS reported that there were

police reports alleging that Michelle battered McArthur in December 2020 and in January 2021. Michelle was engaging in supervised visits with the children. The visits were not allowed to occur in Michelle's home because of the past domestic violence incidents in the home.

¶ 28 On February 9, 2021, DCFS filed another addendum to its report, indicating that on January 27, 2021, the caseworker spoke to Michelle by phone and thought that she sounded intoxicated. The caseworker contacted the Salem Police Department and asked them to perform a welfare check. Upon arrival, the police noted that Michelle and McArthur were present and, based upon their condition, called for emergency medical services, believing that both could have overdosed. Michelle and McArthur were transported to the area hospital. Michelle self-reported that she had taken a Xanax pill and stated her intent to admit herself to a substance abuse facility the following week. On February 4, 2021, Michelle admitted herself to a Gateway substance abuse facility.

¶ 29 On March 10, 2021, DCFS filed a permanency hearing report. Michelle was successfully discharged from substance abuse treatment on March 3, 2021. Her Gateway counselor advised that Michelle would be set up for outpatient substance abuse treatment at CRC and that she would also be continuing with domestic violence counseling. She was scheduled for an individual counseling session at CRC, after which she would be enrolled back into group therapies. Michelle was currently unemployed and receiving unemployment benefits. She failed to show for a required drug test on January 27, 2021. Following a permanency hearing on March 24, 2021, the court entered an order to maintain the permanency goal to return the children home within 12 months and continued guardianship and custody of the children with DCFS.

¶ 30 On April 28, 2021, DCFS filed a family service plan. DCFS's evaluation of Michelle's progress on the plan occurred on April 8, 2001. Michelle had service plan objectives involving substance abuse, mental health, parenting, domestic violence, anger management, employment,

housing, provision of contact information, maintaining DCFS appointments, and visitation. Michelle was rated satisfactory on completion of inpatient substance abuse treatment, but unsatisfactory on complying with mandatory drug tests because she failed to appear for a test on March 26, 2021. She was also successful in maintaining visitation with her children and signing consent forms to allow DCFS access to her records. On all other service plan objectives, Michelle received unsatisfactory ratings.

¶ 31    On June 7, 2021, DCFS filed a permanency hearing report. Michelle was reported to be continuing her outpatient substance abuse work at CRC. She was also attending the integrated group therapy sessions that involved domestic violence, substance abuse, and mental health. However, she had not had an individual mental health therapy session since the last report and missed two scheduled sessions. Michelle was unemployed and failed to appear for three mandatory drug tests from March 26, 2021, to May 28, 2021. Michelle was scheduled to begin parenting classes on June 17, 2021, but she had not completed her anger management prerequisite program. Michelle had a weekly two-hour visit with both children that she consistently attended. DCFS recommended that the permanency goal remain the same—return home within 12 months.

¶ 32    DCFS filed a status hearing report on September 22, 2021. DCFS met with Michelle in her home in August 2021. Michelle reported that she now had a probation officer due to the incident when she hit a police officer. Michelle did not consistently attend appointments for mental health therapy. Michelle reported that she tested positive for marijuana twice with tests mandated by her probation officer. Michelle informed the new caseworker that the previous caseworker said that it was fine if she used marijuana. The current caseworker disputed this and informed Michelle that she was required to refrain from all substances. Michelle failed to appear for four mandatory drug tests from June 16, 2021, through July 26, 2021. Michelle continued to attend the group therapy

11

sessions that involved domestic violence, substance abuse, and mental health, and attended parenting classes.[4] Michelle attended domestic violence classes through May 2021 and Michelle attended most of her visitation sessions. DCFS did not recommend a change in the permanency goal.

¶ 33    The trial court held a permanency hearing on September 27, 2021. The court maintained the permanency goal to return home within 12 months and found that Michelle had failed to make reasonable efforts or progress because she was inconsistent with mental health counseling and had missed several required drug tests. The court continued custody and guardianship with DCFS.

¶ 34    DCFS filed its next status hearing report on November 4, 2021. Michelle's service plan objectives were the same, with recommended individual and group therapies in all categories. Michelle remained unemployed. After testing positive for COVID-19, Michelle lost her cash-based job watching/caring for an elderly gentleman. Michelle advised her caseworker that during her COVID-19 quarantine, she was attending services by phone. DCFS had no confirmation of this statement. CRC informed DCFS that Michelle had completed parenting education classes. With her domestic violence services, the provider indicated that Michelle had only attended one session on October 14, 2021, since the last report. Michelle still needed to complete sessions 7 through 11. Michelle's visitation attendance had remained consistent. DCFS maintained its recommendation to return the children home within 12 months.

¶ 35    DCFS filed a family service plan dated September 28, 2021, on November 5, 2021. Michelle remained sporadic in all services. She had completed parenting classes. DCFS reported that Michelle had started a cash job assisting an elderly man on September 29, 2021. Michelle

---

[4]The reports do not indicate whether Michelle completed the prerequisite anger management program or whether DCFS ultimately waived the prerequisite.

remained on probation for assaulting a police office, having pled guilty to the charge. Due to a caseworker change, no required substance abuse tests had been scheduled since the July 26, 2021, missed test. DCFS planned to resume testing and reported that the case had been referred for a legal screen in late September 2021.

¶ 36   On February 1, 2022, DCFS filed its next permanency hearing report, noting that the case had passed a legal screening process on November 30, 2021. Michelle was consistent in attendance of her integrated domestic violence, substance abuse, and mental health group sessions, but she missed half of her individual mental health therapy sessions. Michelle was scheduled for drug tests both through DCFS and the probation department. Michelle did not appear for a DCFS test on December 30, 2021, but had appeared on January 26, 2022, with those results pending. Her November 29, 2021, probation drug test was positive for alcohol and marijuana, and her January 6, 2022, probation drug test was positive for marijuana. Michelle completed her domestic violence classes, but DCFS attached a copy of a police report indicating additional domestic violence issues. Michelle was consistent with visitation. DCFS reported that Michelle's biggest barrier for reunification was a lack of transportation (because her car had been repossessed for nonpayment), housing, and employment. DCFS recommended that the permanency goal be changed to substitute care pending termination of parental rights.

¶ 37   On February 15, 2022, the State filed a petition for termination of Michelle's parental rights. The State alleged two grounds for a finding that Michelle was an unfit person—(1) that she failed to make reasonable efforts to correct the conditions that were the basis for the removal of her children during any nine-month period following the adjudication of neglect and specifically between July 22, 2020, to April 22, 2021, and/or December 28, 2020, to September 2021 (750 ILCS 50/1(D)(m)(i) (West 2018)); and (2) that she failed to make reasonable progress toward the

13

return of her children during any nine-month period following the adjudication of neglect and specifically between July 22, 2020, to April 22, 2021, and/or December 28, 2020, to September 2021 (*id.* § 1(D)(m)(ii)).

¶ 38 On March 14, 2022, the trial court held a permanency hearing, following which, it changed its permanency goal to substitute care pending the court's determination of parental rights. The court found that Michelle had not made reasonable efforts because she was not consistently engaged in services, and that she had not made reasonable progress because she only recently allowed DCFS to inspect her home.

¶ 39 On April 21, 2022, DCFS filed a family service plan dated March 27, 2022. Michelle's home was assessed by her caseworker and approved for visits with the children. DCFS reported that Michelle started working for Burger King. Michelle was reported to be sporadic in most of her services. Michelle's January 26, 2022, and February 28, 2022, DCFS drug tests were positive for marijuana, and she failed to appear for a drug test on February 25, 2022.

¶ 40 DCFS filed a fitness hearing report on April 27, 2022, reporting that progress in this case had been minimal; Michelle took little to no responsibility for her actions that led to the removal of the children; and that, while she worked on service plan objectives, she was not learning or implementing anything learned from those services into her daily routine. Michelle's work schedule made it difficult for random drug tests. With the probation office, she tested positive for marijuana and alcohol on March 23, 2022, and failed to report for the next three drug tests. She missed two DCFS drug tests in February and March 2022.

¶ 41 On July 27, 2022, the trial court began, but did not conclude, the fitness hearing. At the beginning of the hearing, Michelle's attorney moved to strike the second nine-month period

14

specified in the termination petition because it improperly overlapped the first nine-month period. The State did not object, and the trial court granted the motion.

¶ 42    The State first called Lindsey Summers to testify at the fitness hearing. Summers previously worked for Caritas Family Solutions from March 2020 to August 2021 as a caseworker. Summers testified that she was the first caseworker on Michelle's case. Summers testified that Michelle's initial service plan involved service needs in mental health, substance abuse, parenting, domestic violence, visitation, and cooperation, which she reviewed with Michelle. Summers stated that to help Michelle with the service plan objectives, she provided her with a list of service providers and the associated phone numbers and made referrals to those providers. Part of being Michelle's caseworker included monthly visits. Summers testified that on occasion, she would show up at Michelle's home, but no one would answer the door. Similarly, she had some difficulties in reaching her by phone and would oftentimes have to leave messages. During the time when Michelle was employed at North American Lighting, Summers indicated that Michelle had barriers to service appointments because of her work schedule. Summers testified that she only saw Michelle's home when the case was opened. She confirmed that visitation was not in Michelle's home due to Michelle's unpredictability. She testified that once each month she attended Michelle's two-hour visitation with her children, and that she had no concerns with Michelle during the observed visitations. Summers testified that the case had not progressed to unsupervised visitation during the time she was Michelle's caseworker. She also testified about the incident in January 2021 when Michelle was incoherent on the phone, and Summers contacted the Salem Police Department to conduct a welfare check. On cross-examination, Summers admitted that she had not reviewed the service plans before her testimony and acknowledged that

15

she could not truthfully say that the service plan copy used as an exhibit at the fitness hearing was identical to what she had prepared.

¶ 43    The State also called Officer Tyler Rose of the Salem Police Department, who responded to a call involving a domestic dispute at Michelle's house on November 12, 2020. He testified that he believed Michelle was under the influence of some substance because "she wasn't making a whole lot of sense." He stated that Michelle had a black eye and a "busted" lip. Overall, he described Michelle as being "very disheveled."

¶ 44    The trial court held the remainder of the fitness hearing on December 14, 2022. The State called Sergeant Garland L. Simmons Jr. of the Salem Police Department who testified that he responded to a report of a domestic incident on January 2, 2021. He spoke with Michelle who alleged that McArthur pushed her into an end table resulting in injuries consisting of scratches on her elbows. Michelle informed Sergeant Simmons that she and McArthur had been in an argument that culminated in him pushing her. Sergeant Simmons testified that he believed that Michelle was intoxicated because she was slurring words. Sergeant Simmons then spoke with McArthur who denied pushing Michelle. When asked about her elbow scratches, McArthur stated that Michelle told him she had fallen on concrete steps, and he believed that fall was the source of the scratches. McArthur acknowledged that he and Michelle had been in a verbal argument.

¶ 45    Sergeant Simmons also testified that he returned to Michelle's home on January 27, 2021, when a Caritas Family Solutions worker requested a welfare check. Upon arriving at the home, and knocking repeatedly on the door, Sergeant Simmons testified that his fellow responding police officer heard mumbling inside. Additionally, a Salem Police Department employee attempted to call Michelle when no one responded to the door, but no one answered the phone. The officers then entered Michelle's home and found her on the floor. McArthur was in the bedroom. Sergeant

16

Simmons testified that both Michelle and McArthur were incoherent and were ultimately taken to the local hospital. The officers were concerned that there was a gas leak in the apartment. Sergeant Simmons was not certain whether there had been a gas leak but testified that the utility company shut off the gas as a precaution.

¶ 46    On January 23, 2023, the court entered an order finding that Michelle was unfit. The trial court criticized the State's presentation of the case in that the only relevant DCFS witness regarding Michelle's notice of, and/or progress on, her service plan was Summers. At issue was the State's failure to provide Summers with the documents used as exhibits prior to the hearing and failure to otherwise prepare her to testify. The court noted that "Ms[.] Summers often answered questions with 'I believe' or 'I don't think so'" and "[h]er responses on direct and cross examination were general, in nature, and the State made no attempt to elicit specific information or refresh her recollection." Although the court found that Summers's testimony was poor and deficient, nothing in Michelle's case-in-chief contradicted her testimony. Summers reviewed the service plans with Michelle and made referrals to outside agencies for services. The court noted that Michelle had been rated unsatisfactory on the service plans dated October 9, 2020, and April 1, 2021. Although Michelle was successful in attending visitation, the court noted that she never achieved unsupervised visits. In concluding that Michelle was unfit, the trial court found the State established by clear and convincing evidence that Michelle had not made reasonable efforts or reasonable progress during the nine-month period specified. In this same order, the trial court found that McArthur was also an unfit person.

¶ 47    Prior to the best interest hearing, DCFS reported that in early July 2023, Michelle's probation officer asked the Salem Police Department to conduct a welfare check. Based upon suicidal ideations, Michelle was transported to the local hospital. She was transferred to Centreville

17

Hospital and checked herself out the following day. In early September, Michelle was arrested in Centralia outside of McArthur's home and charged with resisting a peace officer and obstructing identification.

¶ 48    DCFS filed its best interest report on October 25, 2023. As of that date, both Mal. H. and Max. H. were living with their paternal grandmother in Centralia. This was the second placement for the children, and DCFS labeled this placement as an adoptive placement. DCFS noted that the paternal grandmother had been an important part of the lives of the children even before they were placed in her care. The caseworker stated that she had witnessed the children look to their grandmother for comfort and security, most recently because of the death of their father. The grandmother had provided the necessary medical care and was consistent with meeting the emotional and physical needs of the children. She worked with the teachers to ensure that the children meet their educational goals. The grandmother informed the caseworker that she intended to provide Michelle with future supervised contact with the children. DCFS asked the trial court to change the permanency goal to adoption.

¶ 49    The best interest hearing was held on November 6, 2023. The State called two witnesses and Michelle testified on her own behalf. As of the date of the hearing, Mal. H. was five years old, and Max. H. was seven.

¶ 50    The State called Felisa Wilkins, who was employed by Caritas Family Solutions as a case manager. She had been assigned to the cases of Mal. H. and Max. H. since August 2021 and testified that she visits the children several times a month. Wilkins described the children as positive, happy children. She was also familiar with the current foster parent, the paternal grandmother, Janice Watson (Watson). Wilkins stated that the interactions between Watson and the children were positive, and that she works with the children, especially with educational needs.

18

As Max. H. has an individual educational plan, Watson spends time with him in the afternoon and evenings working on schoolwork. The children were placed in Watson's care on June 30, 2023. She stated that the children have expressly told her that they "want to stay where they are." More specifically, Max. H. informed Wilkins that he wanted to stay with his sister. Wilkins testified that she has no concerns about the relationship the children have with Watson; about their safety and well-being in that household; or about her ability to provide for the children's needs, including medical, dental, and vision needs. Both children have their own bedrooms. Overall, Wilkins testified that she believed that the children would best be served by being adopted by Watson.

¶ 51    Wilkins also testified that Michelle had been scheduled recently for drug tests, but she failed to appear. In addition, Wilkins was informed by Michelle's probation officer that she recently tested positive for methamphetamine. Wilkins testified that the children are happy during their visits with Michelle, and that those visits were positive.

¶ 52    On cross-examination, Wilkins testified that although Watson was 70 years old, she had no concerns about her ability to care for the children. She received social security benefits, no longer works, and owns her own home in Centralia.

¶ 53    The State next called Janice Watson who testified that the children love her, and that she loves and is committed to them. She stated that she would adopt both children if given the opportunity. Before DCFS became involved with the children, Watson stated that she saw the children two or three times each week. After DCFS removed the children from Michelle's home, she only saw the children at McArthur's visitation sessions. Watson testified about the educational and health issues the children had when they came into her care. Max. H. had missed 70% of school days the previous year and was significantly behind on grade-level knowledge. Watson testified that the children needed eyeglasses, and extensive dental work, and she took care of those

needs. She testified that the children were both receiving counseling at CRC as they "have been through a lot." Watson testified that Max. H. was scared when he was first moved to Watson's home but adjusted and was fine within two to three weeks. As of the date of the hearing, the children referred to Watson's house as "home," and both called her Nana. Watson confirmed that she wanted Michelle to remain involved with the children.

¶ 54 Michelle testified that she was currently unemployed. She had resumed work at North American Lighting but quit to work for the Illinois Department of Rehabilitation Services (DORS). She explained that DORS work involved assisting a client in his or her home. As of the date of the fitness hearing, Michelle had lost her client, having only worked for DORS less than three weeks. Michelle testified that people working for DORS must find their own clients, and then get the client set up with the department for paid services. Michelle testified that she continued to utilize every visitation opportunity with Mal. H. and Max. H. Michelle testified that she was still engaged in services and was checking herself into a substance abuse rehabilitation facility the day after the hearing because she had relapsed. On cross-examination by the guardian *ad litem* (GAL), Michelle testified that she remained on probation for her 2020 charge of aggravated battery of a police officer. She also testified that she was not current on her rent.

¶ 55 At the conclusion of the hearing, the trial court asked the GAL for her recommendation, which was that she believed that it was in the best interest of these children to terminate Michelle's parental rights. The trial court stated that it had considered the testimony of Wilkins, Watson, and Michelle, as well as the GAL's recommendation. Noting that the children had been in foster care since April 2020, the court expressed its frustration that the failings in the education of the children and in their dental care occurred while the children were wards of the court. The court indicated that it was clear that Michelle loved her children, but that the children were bonded with Watson

20

and needed permanency. The court found that Watson's intentions of keeping Michelle in the children's lives was beneficial. The court concluded that the State had established that termination of Michelle's parental rights was necessary. The court entered an order of termination on the same date.

¶ 56                                II. ANALYSIS

¶ 57     Michelle appeals from the trial court's orders finding she was an unfit person and that her parental rights should be terminated. The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)) provide the legal authority for the involuntary termination of parental rights in Illinois. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 30 (citing *In re J.L.*, 236 Ill. 2d 329, 337 (2010)). Section 2-29 of the Juvenile Court Act of 1987 provides the procedural basis for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2020). The process mandated involves two hearings. In the first hearing, the State must prove by clear and convincing evidence that the parent is an "unfit person" as defined by the Adoption Act. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 30 (citing *In re A.J.*, 269 Ill. App. 3d 824, 828 (1994)); 750 ILCS 50/1(D) (West 2020). If the trial court finds that the parent is unfit, the case proceeds to a second hearing where the State must prove, by a preponderance of the evidence, that it is in the child's best interest that the parent's rights be terminated. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 30 (citing *In re J.L.*, 236 Ill. 2d at 337-38); 705 ILCS 405/2-29(2) (West 2020).

¶ 58     When a parent appeals the trial court's findings that a parent is unfit and that terminating the parental rights is in the child's best interest, the appellate court must not retry the case but, instead, must review the trial court's findings to determine if the findings are against the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31 (citing *In re A.W.*, 231 Ill.

21

2d 92, 104 (2008)). The reviewing court gives great deference to the trial court's finding of unfitness because the court had the best opportunity to view and evaluate the parties and their testimony. *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006)). Therefore, we do not reweigh the evidence or reassess the credibility of the witnesses on appeal. *Id.* (citing *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001)). "A decision is contrary to the manifest weight of the evidence if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *Id.* (citing *In re Vanessa K.*, 2011 IL App (3d) 100545, ¶ 28).

¶ 59                                   A. Fitness

¶ 60    We first review the evidence to determine if the State met its burden of proving, by clear and convincing evidence, that Michelle was an "unfit person." The trial court determined that the State met its burden of proof on the following bases: (1) that Michelle failed to make reasonable efforts to correct the conditions that were the basis for the removal of Mal. H. and Max. H. during a specific nine-month period after the adjudication of neglect, from July 22, 2020, to April 22, 2021 (750 ILCS 50/1(D)(m)(i) (West 2018)); and (2) that Michelle failed to make reasonable progress toward the return of Mal. H. and Max. H. during a specific nine-month period after the adjudication of neglect, from July 22, 2020, to April 22, 2021 (*id.* § 1(D)(b)(ii)).

¶ 61    Michelle argues that the trial court erred in finding that she was an unfit person because there was inadequate evidence that she failed to make reasonable efforts and/or reasonable progress during that specific nine-month period. The service plan at issue only covered the period up to April 1, 2021, but the State's termination petition alleged that the nine-month period continued for three additional weeks, through April 22, 2021. She also argues that the practice of rating her compliance with service plan objectives as unsatisfactory because she had not *completed* services was unfair because she actively *engaged* in services.

¶ 62                1. *Reasonable Effort Within a Specific Nine-Month Period*

¶ 63    "Reasonable effort" is determined by a subjective standard that refers to the amount of effort which is reasonable for that parent. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 44; *In re Daphnie E.*, 368 Ill. App. 3d at 1066-67. The court must determine whether the parent has made committed and diligent efforts toward correcting the conditions that led to the removal of the minor from the home. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24. "A parent's deficiencies collateral to the conditions that were the basis for the removal of the children are not relevant to the reasonable efforts analysis." *In re D.F.*, 332 Ill. App. 3d 112, 125 (2002).

¶ 64    Michelle argues that the trial court's finding that she was unfit for failure to make reasonable efforts to correct the conditions that brought Mal. H. and Max. H. into DCFS custody was contrary to the manifest weight of the evidence. The foundational basis for DCFS involvement in this case was domestic violence coupled with substance abuse. DCFS determined that Michelle needed to participate and engage in services related to domestic violence, mental health, substance abuse, anger management, and visitation. These service plan objectives were designed to ensure that Mal. H. and Max. H. would be safe and secure if custody and guardianship were placed with Michelle. Michelle failed to successfully complete most of the requested services, and thus did not make "a committed and diligent effort" to correct the underlying conditions that brought Mal. H. and Max. H. into the custody and guardianship of DCFS. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24. Based on the facts outlined in DCFS's court reports plus testimony during the fitness hearing, it was clear that domestic violence and substance abuse continued in Michelle's life, and that some, if not all, of these domestic violence incidents occurred when Michelle was intoxicated. DCFS's service plan objectives were clearly designed to address Michelle's issues with domestic violence, mental health, anger management, and substance abuse. Also apparent from the reported episodes

23

of domestic violence was that Michelle has anger management issues. Despite being offered services, the record does not contain proof that she successfully completed those services. While engagement in services is admirable, completion of services and application of skills learned in those services is the standard required by DCFS. We find no error in the trial court's analysis and conclusion despite Michelle's concern that there was no specific evidence regarding the last three weeks of the nine-month period. We conclude that the trial court's order finding that Michelle failed to show a reasonable effort toward correcting these conditions during the specified nine-month period from July 22, 2020, to April 22, 2021, is not contrary to the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31 (citing *In re Vanessa K.*, 2011 IL App (3d) 100545, ¶ 28).

¶ 65          2. *Reasonable Progress Within a Specific Nine-Month Period*

¶ 66    The term "reasonable progress" requires an objective determination regarding the amount of progress based upon the conditions existing at the time the minor child's custody was removed from the parent. *Id.* ¶ 47 (citing *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17).

> " 'The benchmark for measuring a parent's reasonable progress under section
> 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service
> plans and court's directives in light of the condition that gave rise to the removal of
> the child and other conditions which later become known that would prevent the
> court from returning custody of the child to the parent.' " *Id.* (quoting *In re D.T.*,
> 2017 IL App (3d) 170120, ¶ 17).

"A parent makes reasonable progress when the trial court can find that the progress 'is sufficiently demonstrable and of such a quality' that the trial court may soon be able to order the return of the minor to the parent's custody." *Id.* (quoting *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17).

¶ 67    Overall, in reviewing the record on appeal, during the approximate three years that Michelle's DCFS case was open, she was unsuccessful in her service plan objectives. However, in its termination petition, the State proceeded on only one nine-month period early in the case—July 22, 2020, to April 22, 2021. In reviewing the family service plans admitted into evidence, coupled with the testimony at the fitness hearing, there is no question that Michelle failed to make reasonable progress during the specific nine-month period at issue. Overall, Michelle's progress was marred by her lack of consistent attendance in services and failure to appear for mandatory drug tests. When she missed a certain number of group sessions in several categories, Michelle was removed from the programs. Additionally, police were called to Michelle's house on November 12, 2020, and January 2, 2021, during the specified nine-month period to respond to domestic violence reports involving Michelle and McArthur in Michelle's home. Michelle was intoxicated on both dates. Thus, Michelle continued to engage in the same behaviors that had resulted in the removal of her children in the first instance. Although Michelle was consistent with supervised visits, given her lack of progress during this nine-month period on her service plan objectives and continued domestic violence incident in the home, we agree with the trial court's finding that Michelle failed to make reasonable progress to correct the conditions that were the basis for the removal of Mal. H. and Max. H. during the specified nine-month period.

¶ 68    We conclude that the trial court's order finding that Michelle was an unfit person is not contrary to the manifest weight of the evidence. *Id.* ¶ 30 (citing *In re A.J.*, 269 Ill. App. 3d at 828).

¶ 69                                    B. Best Interest

¶ 70    Termination of a parent's rights is a difficult and final step. *In re Adoption of Syck*, 138 Ill. 2d at 274-75. Parents maintain the important right to raise their own children. *Id.* However, when a parent has been declared "unfit," "the parent's rights must yield to the child's best interest." *In re*

25

*Tashika F.*, 333 Ill. App. 3d 165, 170 (2002); *In re J.L.*, 236 Ill. 2d at 337-38. The interests of the parent and the child remain concurrent "to the extent that they both 'share a vital interest in preventing erroneous termination of their natural relationship' " until the court declares that the parent is unfit. *In re D.T.*, 212 Ill. 2d 347, 363 (2004) (quoting *Santosky v. Kramer*, 455 U.S. 745, 760-61 (1982)).

¶ 71     At the best interest hearing, the State must establish proof that termination of a parent's rights is in the child's best interest by a preponderance of the evidence. 705 ILCS 405/2-29(2) (West 2020); *In re D.T.*, 212 Ill. 2d at 366. We review the trial court's best-interest decision with the manifest weight of the evidence standard. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009); *In re S.J.*, 368 Ill. App. 3d 749, 755 (2006). A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the court should have reached the opposite result. *In re Daphnie E.*, 368 Ill. App. 3d at 1072. On appeal from an order terminating a parent's rights, the reviewing court gives great deference to the trial court's decision because the trial court was in a much better position to see the witnesses and judge their credibility. *In re K.B.*, 314 Ill. App. 3d 739, 748 (2000).

¶ 72     "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d at 364. The trial court must analyze several factors within "the context of the child's age and developmental needs" when considering if termination of parental rights serves a child's best interest. 705 ILCS 405/1-3(4.05) (West 2020). Those factors include:

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

26

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (asopposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." *Id.*

The trial court is not required to make an explicit finding on each of the best interest factors. *In re Ca. B.*, 2019 IL App (1st) 181024, ¶ 33 (citing *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19); *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43 (citing *In re Marriage of Diehl*, 221 Ill. App. 3d 410, 424 (1991)). Another factor the trial court may consider is the likelihood of adoption. *In re Tashika F.*, 333 Ill. App. 3d at 170.

¶ 73 During the best interest hearing, Michelle testified that she did not believe that termination of her parental rights was warranted because she was consistent with visitation and that her

children were upset at the end of each supervised visit. Michelle's attorney asked the trial court not to terminate her parental rights, but to grant Watson guardianship of the children so that Michelle could complete services and potentially have the children returned to her. The trial court found that Mal. H. and Max. H.'s current relative foster placement with Watson provided safety, consistency, and permanency for the children. Watson planned to adopt the children and had expressed her willingness to include Michelle in the children's lives. Michelle had recently relapsed with methamphetamine, was unemployed, was behind on her rent, and was not capable of providing the stability the children deserved. Additionally, the GAL recommended termination of Michelle's parental rights.

¶ 74    The record clearly establishes that termination of Michelle's parental rights was the appropriate outcome for Mal. H. and Max. H. We conclude that the trial court's decision to terminate Michelle's parental rights was not contrary to the manifest weight of the evidence. *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002).

¶ 75                                    III. CONCLUSION

¶ 76    For the foregoing reasons, we affirm the judgments of the circuit court of Marion County finding that Michelle was an unfit parent, and that the best interest of Mal. H. and Max. H. required the termination of her parental rights.


¶ 77    Affirmed.

28